**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

| | |
|---|---|
| PAULA CORNELISON,<br><br>        Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br><br>        Defendant. | No. ED CV 11-440-PLA<br><br>**MEMORANDUM OPINION AND ORDER** |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on March 21, 2011, seeking review of the Commissioner's denial of her application for Disability Insurance Benefits. The parties filed Consents to proceed before the undersigned Magistrate Judge on March 29, 2011, and April 4, 2011. The parties filed a Joint Stipulation on October 18, 2011, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

/

## II.

## BACKGROUND

Plaintiff was born on July 22, 1954. [Administrative Record ("AR") at 79-80.] She completed three years of college, and has past relevant work experience as a security officer, a packager, an inventory counter, a laundry attendant, and a caregiver and housekeeper. [AR at 127-28, 130.]

On June 23, 2008, plaintiff filed her application for Disability Insurance Benefits, alleging that she has been disabled since May 18, 2008, due to bipolar disorder, anxiety, and constant ringing in her ears. [AR at 79-80, 101, 125-31, 196-202.] After plaintiff's application was denied initially and upon reconsideration, she requested a hearing before an Administrative Law Judge ("ALJ"). [AR at 81-92.] A hearing was held on March 9, 2010, at which time plaintiff appeared with her attorney and testified on her own behalf. [AR at 20-53.] A medical expert ("ME") and a vocational expert also testified. [AR at 41-53.] On April 8, 2010, the ALJ determined that plaintiff was not disabled. [AR at 9-16.] When the Appeals Council denied plaintiff's request for review of the hearing decision on January 7, 2011, the ALJ's decision became the final decision of the Commissioner. [AR at 1-4.] This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257. When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well

as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner. Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

## IV.

## **THE EVALUATION OF DISABILITY**

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

**A.     THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Id. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled

and the claim is denied. Id. The claimant has the burden of proving that she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. The Commissioner then bears the burden of establishing that the claimant is not disabled, because she can perform other substantial gainful work available in the national economy. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.     THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

In this case, at step one, the ALJ concluded that plaintiff has not engaged in any substantial gainful activity since her alleged disability onset date, May 18, 2008. [AR at 11.][1] At step two, the ALJ concluded that plaintiff has the severe impairments of affective mood disorder, anxiety, and obesity. [Id.] At step three, the ALJ concluded that plaintiff's impairments do not meet or equal any of the impairments in the Listing. [AR at 12.] The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[2] to perform medium work as defined in 20 C.F.R. § 404.1567(c).[3] [AR at 12-13.] Specifically, the ALJ found that plaintiff "can sit, stand, and walk 6 hours in an 8 hour workday; lift and carry 50 pounds occasionally and 20 pounds frequently; frequent postural limitations except no ladders; able to do 4 to 5 step object[] oriented tasks; cannot be in charge of safety operations; cannot work around hazardous or fast moving machinery; and cannot perform rapid assembly line work." [Id.] At step four, the ALJ concluded that plaintiff is able to perform her past relevant work as a laundry laborer and an inventory clerk. [AR at 15.] Accordingly, the ALJ determined that plaintiff is not disabled. [AR at 16.]

---

[1]  The ALJ concluded that plaintiff meets the insured status requirements of the Social Security Act through September 30, 2013. [AR at 11.]

[2]  RFC is what a claimant can still do despite existing exertional and nonexertional limitations. Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

[3]  20 C.F.R. § 404.1567(c) defines "medium work" as work that involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."

# V.

# **THE ALJ'S DECISION**

Plaintiff contends that: (1) the ALJ failed to properly evaluate the opinion of the treating physician and properly develop the record; (2) the ALJ improperly evaluated the state agency physician's opinion; (3) the ALJ's determination of plaintiff's residual functional capacity was erroneous; and (4) the ALJ posed an incomplete hypothetical question to the vocational expert. [Joint Stipulation ("JS") at 2-3.] As set forth below, the Court agrees with plaintiff, in part, and remands the matter for further proceedings.

**TREATING PHYSICIAN'S OPINION**

Plaintiff argues that the ALJ improperly rejected the treating physician's opinion. [JS at 3-10.] The Court agrees.

In evaluating medical opinions, the case law and regulations distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians). See 20 C.F.R. §§ 404.1502, 404.1527, 416.902, 416.927; see also Lester, 81 F.3d at 830. Generally, the opinions of treating physicians are given greater weight than those of other physicians, because treating physicians are employed to cure and therefore have a greater opportunity to know and observe the claimant. Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007); Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996). Despite the presumption of special weight afforded to treating physicians' opinions, an ALJ is not bound to accept the opinion of a treating physician. Where a treating physician's opinion does not contradict other medical evidence, an ALJ must provide clear and convincing reasons supported by substantial evidence to discount it. Where a treating physician's opinion conflicts with other medical evidence, an ALJ may afford it less weight only if the ALJ provides specific and legitimate reasons supported by substantial evidence for discounting the opinion. See Lester, 81 F.3d at 830; see also Orn, 495 F.3d at 632-33 ("Even when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is 'still entitled to

deference.'") (citation omitted); Social Security Ruling[4] 96-2p (a finding that a treating physician's opinion is not entitled to controlling weight does not mean that the opinion is rejected).

According to SSR 06-3p, an ALJ must also consider the opinions of medical sources who are not, according to the regulations, an "acceptable medical source"[5] -- i.e., social workers and therapists -- by weighing a set of factors, including "[h]ow consistent the opinion is with other evidence." See SSR 06-3p, 2006 WL 2329939, at *4-5 (listing factors that must be considered); see id. at *3 ("[M]edical sources who are not 'acceptable medical sources,' such as . . . licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."). Although an ALJ may give an acceptable medical source's opinion more weight than opinions from other sources (see 20 C.F.R. §§ 404.1527, 416.927; Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996)), the ALJ may not completely disregard opinions from "other sources" -- such as social workers -- just because they are not "acceptable medical sources." See Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987) (an ALJ is required to "consider observations by non-[acceptable] medical sources as to how an impairment affects a claimant's ability to work"). Rather, to properly reject the opinions of a non-acceptable medical source, such as a social worker, the ALJ must provide "reasons germane to [that source]." Turner v. Comm'r of Social Sec., 613 F.3d 1217, 1224 (9th Cir. 2010) (quoting Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001)).

The record shows that plaintiff received treatment from at least two Riverside County Department of Mental Health ("RCMH") clinics from July 2005 until January 2010. [AR at 213-26, 232-33, 284-85, 441.] On average, staff at RCMH saw plaintiff monthly between August 2005 and

---

[4] Social Security Rulings ("SSR") do not have the force of law. Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

[5] "Acceptable medical sources" include, among other professionals, licensed physicians and psychologists. 20 C.F.R. §§ 404.1513(a), 404.1527(d), 416.913(a), 416.927(d).

6

August 2006 [AR at 237-49], every other month between September 2006 and August 2007 [AR at 276-83], and monthly again between October 2007 and August 2008. [AR at 252-54, 257-58, 263-66, 271-75.] In a psychiatric evaluation performed on plaintiff on July 25, 2005, RCMH physician Dr. A. Hanna noted that plaintiff's affect was "full range" and that her thought process was "goal directed," and assigned her a Global Assessment of Functioning score of 58-60.[6] [AR at 213-18.] On August 4, 2005, an RCMH licensed clinical social worker completed a mental status examination for plaintiff, indicating that plaintiff's mood was "angry" and that her insight and judgment were "poor," and assigning her a GAF score of 45.[7] [AR at 233-34.] On September 6, 2006, RCMH psychiatrist Denise Joseph performed a psychiatric evaluation of plaintiff, and then diagnosed her with bipolar II disorder[8] and assigned her a GAF score of 55. [AR at 281-83.] Dr. Joseph again diagnosed plaintiff with bipolar II disorder on October 25, 2006. [AR at 279.] On March 2, 2007, RCMH physician Dr. Raag[9] saw plaintiff and noted that plaintiff reported occasionally feeling "good." [AR at 276.] Dr. Raag also recorded that plaintiff "was talkative" and

---

[6] A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 32 (4th ed. 2000). A GAF score in the range of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). Id. at 34.

[7] A GAF score in the range of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning (e.g., unable to keep a job). DSM-IV, at 32.

[8] According to the DSM-IV, bipolar II disorder "is characterized by one or more Major Depressive Episodes accompanied by at least one Hypomanic Episode." DSM-IV, at 345. The characteristic signs and symptoms of a hypomanic episode include a persistently elevated, expansive, or irritable mood, inflated self-esteem or grandiosity, decreased need for sleep, being pressured to keep talking or more talkative than usual, having flight of ideas, distractability, increase in goal-directed activity, and excessive involvement in pleasurable activities that have a high potential for painful consequences. See id. at 368.

[9] Plaintiff represents, and defendant does not dispute, that Dr. Raag from RCMH completed a narrative report on behalf of plaintiff on August 4, 2008. [JS at 3; AR at 329.] It appears from the record that Dr. Raag saw plaintiff at least on January 31, 2007, March 2, 2007, May 30, 2007, August 22, 2007, December 19, 2007, February 13, 2008, March 26, 2008, and June 18, 2008. [AR at 270-71, 273, 276-77, 345.]

assessed her as having "[a] little hypomania." [Id.] On May 30, 2007, Dr. Raag saw plaintiff again and noted that she was talkative and that her speech was moderately pressured. [Id.] Dr. Raag reported in a November 7, 2007, progress note that plaintiff was occasionally restless [AR at 274]; in a December 19, 2007, progress note that plaintiff's attention/concentration was "short" [AR at 273]; and in a February 13, 2008, progress note that plaintiff's speech was mildly pressured and that her attention/concentration was "short." [AR at 271, 347.] On June 18, 2008, Dr. Raag saw plaintiff again and noted that her speech was mildly pressured, that her attention/concentration seemed short and impaired, that her affect was labile, and that she was experiencing sleep problems due to restlessness. [AR at 345.] On August 4, 2008, Dr. Raag completed a narrative report concerning plaintiff, in which he diagnosed plaintiff with bipolar II disorder and noted that plaintiff has exhibited evidence of insomnia, depression, anxiety, and panic episodes, and has a history of manic syndrome. [AR at 329.] He opined that plaintiff cannot maintain a sustained level of concentration, cannot sustain repetitive tasks for an extended period, cannot adapt to new or stressful situations, and cannot interact appropriately with strangers or supervisors. [Id.] He also indicated that he was uncertain whether plaintiff could interact appropriately with coworkers. [Id.] Dr. Raag concluded that plaintiff cannot complete a 40-hour work week without decompensating and assigned her a GAF score of 55. [Id.]

In rejecting the opinions of the RCMH treating sources, the ALJ stated that he gave "significant weight to the opinions and testimony of [the medical expert]." [AR at 13.] Specifically, the ALJ cited the ME's opinion that despite the notes in the medical record diagnosing plaintiff with bipolar disorder, "there [is] no rationale for such [a] diagnosis since there is no evidence of mania and [plaintiff's] complaints are consistent with depressive disorder." [Id.] According to the ALJ, the ME "further opined that the mental status examination[s] in [the] treating notes [were] mild overall and that the [GAF] scores are not indicative of disability and are not consistent with occupational functioning level." [AR at 13-14.] The ALJ concluded that the ME's opinions "are well supported by the medical evidence of record," and that plaintiff's "longitudinal medical history is not consistent with her allegation of disability." [AR at 14.] In support, the ALJ first noted that plaintiff "was able to return to [the] work force" after being "hospitalized in May 2004 for bipolar

disorder with psychotic features." [Id.] The ALJ then went on to discuss various mental status examinations and progress notes from plaintiff's RCMH treatment record, which he concluded deserved "less weight." [Id.] He noted that Dr. Hanna's July 25, 2005, psychiatric evaluation of plaintiff "was mild overall" and revealed fair insight and impulse control, among other things, despite Dr. Hanna's diagnosis of plaintiff with panic attacks and assignment of a GAF score of 58-60. [Id.] The ALJ also pointed out that although the treating note of August 4, 2005, diagnosed plaintiff with dysthymia, major depressive disorder, and anxiety not otherwise specified, and assigned her a GAF score of 45,[10] the mental status examination from that visit "was mild" and subsequent progress notes dated April 10, 2006, October 2006, and February 13, 2008, indicated that plaintiff was "pretty good," "improved," and suffering from fewer mood swings, respectively. [Id.] Next, the ALJ noted that while plaintiff complained of depression with anxiety and mood swings on June 18, 2008,[11] she also stated on that day that she was "thinking of applying for SSI," and stated in April and December 2009 that she was "better." [Id.] In conclusion, the ALJ stated that he found Dr. Raag's GAF assessment of 55 and his finding that plaintiff cannot complete a 40-hour work week without decompensation, as expressed in his August 4, 2008, narrative report, to be conclusory because those opinions were "not supported by the preceding mental status examination," which found plaintiff to have "concrete thought[,] mildly impaired memory[,] and intact judgment." [AR at 14-15.] In addition, the ALJ reasoned, "the mental status examinations on previous visits were relatively mild," citing the already-discussed examinations and/or progress notes dated July 25, 2005, August 4, 2005, April 10, 2006, and October 2006. [AR at 15.]

In order to reject the opinions of plaintiff's treating physicians at the Riverside County Department of Mental Health based on the ME's contrary opinion and based on the ALJ's finding that the treating physicians' findings were not sufficiently supported by objective medical evidence,

---

[10] The ALJ stated that the August 4, 2005, treating note assigned plaintiff a GAF score of 45-55, but the note actually assigned plaintiff a GAF score of 45 as of that visit, and a score of 55 as the highest for the year preceding the visit. [See AR at 14, 233.]

[11] The ALJ incorrectly referred to this progress note as being dated June 28, 2008. [See AR at 14, 345.]

the ALJ was required to set forth specific, legitimate reasons supported by substantial evidence for doing so. See Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) ("The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record.") (citation omitted); Embrey v. Bowen, 849 F.2d 418, 421-23 (9th Cir. 1988) ("To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required. . . . The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.") (footnote omitted). Moreover, in order to reject the opinions of the RCMH social worker, the ALJ was required to set forth reasons germane to that social worker. See Turner, 613 F.3d at 1224. While the ALJ set forth specific reasons for rejecting the treating sources' opinions, the Court finds that his reasons were not legally sufficient.

First, the Court rejects the ALJ's reliance on the fact that plaintiff had worked after being hospitalized in May 2004 for bipolar disorder in order to discount the treating sources' opinions. In May 2004, plaintiff was hospitalized for an unspecified number of days in the psychiatric ward at College Hospital of Cerritos. [AR at 412-13.] Upon admission and discharge, she was diagnosed with "bipolar affective disorder, most recent episode mixed with psychotic features." [AR at 412.] After being discharged, she worked as a laundry attendant from August 2005 to December 2005 and as a caregiver and housekeeper from January 2006 to May 2008. [AR at 135.] In relying on these facts to argue that plaintiff's "longitudinal medical history is not consistent with her allegation of disability" [AR at 14], the ALJ appears to argue that since plaintiff was able to work after her 2004 diagnosis of and hospitalization for "bipolar affective disorder, most recent episode mixed with psychotic features," she should also be able to work now, and therefore is not disabled. The Commissioner cites no authority, however, for the proposition that once a claimant can work despite an impairment, she is always able to work despite that impairment. Moreover, such a proposition incorrectly assumes that an impairment that is not initially disabling cannot later become disabling. See Swanson v. Sec'y of Health and Human Services, 763 F.2d 1061, 1065

(9th Cir. 1985) (stating that although plaintiff suffered some impairment prior to her disability onset date, her impairment during that time "was not so severe as to render her disabled before [the onset date]"). Rather, the fact that plaintiff worked after being hospitalized in 2004 is irrelevant to her RCMH treating sources' opinions concerning her medical condition after the time that she stopped working, including Dr. Raag's August 4, 2008, evaluation of plaintiff's ability to work. The Court therefore finds that the ALJ's rejection of the RCMH treating sources' opinions based on this ground was not supported by substantial evidence. See Moncada, 60 F.3d at 523 (substantial evidence "is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion") (emphasis added).

Second, in adopting the ME's conclusion that "there was no rationale for . . . [a] diagnosis [of bipolar disorder] since there is no evidence of mania" [see AR at 13], the ALJ erred by selectively relying on particular findings in plaintiff's treatment records and by ignoring relevant evidence in the record supporting that diagnosis. The ALJ may not point to and discuss only those portions of the treatment record that favor his ultimate conclusion. See Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (error for an ALJ to ignore or misstate the competent evidence in the record in order to justify his conclusion); see also Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983) (while the ALJ is not obligated to "reconcile explicitly every conflicting shred of medical testimony," he cannot simply selectively choose evidence in the record that supports his conclusions); Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982) ("an ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion") (citation omitted); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is not permitted to reach a conclusion "simply by isolating a specific quantum of supporting evidence").

The ALJ selectively relied on plaintiff's treatment records when, for example, he cited an April 10, 2006, progress note in which the treating source had written "pretty good," and an October 2006, progress note containing the word "improved" in order to discount the RCMH social worker's August 4, 2005, treating note diagnosing plaintiff with dysthymia, major depressive disorder, and anxiety not otherwise specified. [AR at 14.] But it is unclear from the handwritten progress notes what specifically about plaintiff's condition was "pretty good" and "improved,"

respectively, on those dates [see AR at 242, 245], and the ALJ does not explain how those notes formed a proper basis for him to reject the social worker's August 4, 2005, diagnoses. [See AR at 14.] Thus, the ALJ erred by failing to give reasons germane to the RCMH social worker to reject the social worker's opinion. See Turner, 613 F.3d at 1224. In discussing plaintiff's treatment record at RCMH, the ALJ also failed to mention progress notes in which Dr. Raag stated that plaintiff was talkative, noted that she reported "occasionally feeling 'good,'" and assessed her as having "a little hypomania"; noted that plaintiff was talkative and that her speech was moderately pressured; and indicated that plaintiff was occasionally restless and had short attention/concentration. [AR at 273-74, 276.] In his decision, the ALJ cited a February 13, 2008, progress note, and noted that it indicated plaintiff was not then depressed and was experiencing fewer mood swings [see AR at 14], but failed to mention that it also indicated plaintiff's speech was mildly pressured and that her attention/concentration was short. [AR at 347.] Next, in discussing a June 18, 2008, progress note completed by Dr. Raag, the ALJ stated that while it noted a labile affect and plaintiff's complaints of depression with anxiety and mood swings, it also indicated that her appearance was appropriate and neat, that her response to medications was fair, and that she was "thinking of applying for SSI." [AR at 14, 345.] The ALJ did not mention, however, that Dr. Raag had reported that plaintiff's speech was mildly pressured, that her attention/concentration was short, and that she was experiencing sleep problems due to restlessness. [Id.] Moreover, the ALJ then stated that "[i]n April and December 2009, [plaintiff] stated she was 'better,'" citing two progress notes. [AR at 14.] The full statements from the April 29, 2009, and December 17, 2009, progress notes, however, were, "better than I was but not as good as I expected to be," and "[symptoms] better but still present," respectively. [AR at 444, 464.] Moreover, the ALJ failed to mention that on the April 29, 2009, visit, plaintiff complained of agitation and being easily upset, and RCMH physician Dr. Marc Stolar diagnosed her with bipolar II disorder [see AR at 14, 464], and that at the December 17, 2009, visit, Dr. Stolar noted that plaintiff is occasionally manic and occasionally euphoric, and again diagnosed her with bipolar II disorder. [See AR at 14, 444.] The ALJ determined that Dr. Raag's August 4, 2008, narrative report was "conclusory and not supported by the preceding mental status examination," or the mental status examinations of July

25, 2005, August 4, 2005, April 10, 2006, and October 2006. [AR at 14-15.] Contrary to the ALJ's assertion, however, there was evidence supporting the RCMH treating physicians' opinion that plaintiff has bipolar II disorder in plaintiff's treatment records dated March 2, 2007, May 30, 2007, November 7, 2007, December 19, 2007, February 13, 2008, June 18, 2008, April 29, 2009, and December 17, 2009. [See AR at 271, 273-74, 276, 345, 347, 444, 464.] Thus, in concluding that "there was no rationale for . . . [a] diagnosis [of bipolar disorder] since there is no evidence of mania," the ALJ failed to properly address "competent evidence" in the record. This was error. See Gallant, 753 F.2d at 1456.

      The ALJ also selectively relied on plaintiff's treatment records when he rejected Dr. Raag's August 4, 2008, GAF assessment of 55 as "conclusory." [AR at 14.] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." Keyser v. Comm'r Social Sec. Admin., 648 F.3d 721, 723 n.5 (9th Cir. 2011) (internal citation omitted). While "GAF scores do not dispositively assess a plaintiff's ability to work" (Garcia v. Astrue, 2011 WL 4479843, at *5 (E.D. Cal. Sept. 26, 2011)), they "are nonetheless relevant." Graham v. Astrue, 385 Fed. Appx. 704, 705 (9th Cir. 2010) (citable for its persuasive value pursuant to Ninth Circuit Rule 36-3) (citing Rollins, 261 F.3d at 856). Since a GAF score is not raw medical data, an ALJ may not use a medical professional's GAF score assessment "to disprove [that source's] more detailed, expert functional assessment" of a claimant. See Smith v. Astrue, 565 F. Supp. 2d 918, 925 (M.D. Tenn. 2008). The ALJ rejected Dr. Raag's GAF assessment of 55 because he found that it was not supported by the mental status examination ("MSE") of the same day, or by the MSEs dated July 25, 2005, August 4, 2005, April 10, 2006, and October 2006. [AR at 13-15.] It appears that Dr. Raag did not perform a mental status examination of plaintiff on August 4, 2008, however, but merely summarized RCMH's findings based on the treatment of plaintiff from August 2005 to June 18, 2008. [See AR at 329.] Moreover, as discussed supra, the ALJ's reliance on the RCMH treating notes of July 25, 2005, April 10, 2006, and October 2006, was selective or unclear at best, and the record contains numerous findings by the RCMH treating sources that the ALJ failed to consider. Next, there is evidence in the record that lends support to Dr. Raag's GAF assessment. For example, RCMH

treating sources noted on August 4, 2005, that plaintiff "has never had a friendship that lasted beyond its initial environment" [AR at 303]; on November 7, 2007, that plaintiff reported being a "loner" [AR at 274]; and on September 26, 2008, that plaintiff "[h]as no family support or friends." [AR at 387.] These all appear to be symptoms of an individual with a GAF score in the range of 51-60.[12] Finally, Dr. Hanna assigned plaintiff a GAF score of 58-60 on July 25, 2005, and Dr. Joseph assigned plaintiff a GAF score of 55 on September 6, 2006. [AR at 218, 283.] Thus, RCMH treating physicians consistently assigned plaintiff GAF scores between 55 and 60. Accordingly, the ALJ's assertion that the RCMH treating sources' findings were inconsistent with Dr. Raag's assessment of a GAF score of 55 is not a specific and legitimate reason to reject Dr. Raag's opinions. See Smith, 565 F. Supp. 2d at 923-25 (claimant's GAF score of 55, which ALJ found inconsistent with psychiatrist's estimated degree of limitations, was not by itself sufficient to discredit psychiatrist's assessment of limitations).

Finally, insofar as the ALJ found the treating sources at RCMH to be less credible because plaintiff told Dr. Raag on June 18, 2008, that she was "thinking of applying for SSI" [see AR at 14], that also was not a proper reason to reject the treating sources' opinions. The ALJ points to no evidence of actual impropriety on the part of Dr. Raag or any other RCMH staff. See Lester, 81 F.3d at 832 (quoting Ratto v. Sec'y, Dept. of Health and Human Servs., 839 F. Supp. 1415, 1426 (D. Or. 1993)) ("The Secretary may not assume that doctors routinely lie in order to help their patients collect disability benefits."); see also Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (citing Saelee v. Chater, 94 F.3d 520, 523 (9th Cir. 1996), cert. denied, 519 U.S. 1113 (1997)) (the source of report is a factor that justifies rejection only if there is evidence of actual impropriety or no medical basis for opinion). The record contains no evidence that the RCMH staff embellished their assessments of plaintiff's limitations in order to assist her with her benefits claim. See Reddick v. Chater, 157 F.3d 715, 725-26 (9th Cir. 1998) (ALJ erred in assuming that the treating physician's opinion was less credible because his job was to be supportive of the patient).

---

[12] See supra, fn 6.

Thus, insofar as the ALJ rejected the RCMH treating sources' opinions on this ground, that rejection was improper.[13]

For the foregoing reasons, remand is warranted.[14]

## VI.

## **REMAND FOR FURTHER PROCEEDINGS**

As a general rule, remand is warranted where additional administrative proceedings could remedy defects in the Commissioner's decision. See Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir.), cert. denied, 531 U.S. 1038 (2000); Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984). In this case, remand is warranted in order for the ALJ to reconsider the opinions of plaintiff's treating sources at the Riverside County Department of Mental Health. The ALJ is instructed to take whatever further action is deemed appropriate and consistent with this decision.

Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: November 30, 2011

/s/ Paul L. Abrams
_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

---

[13] Plaintiff also contends that because the ALJ did not include in the RFC certain limitations found by Dr. Raag in his August 4, 2008, narrative report, "it appears that the ALJ implicitly rejected these findings." [JS at 6-7.] However, the ALJ explicitly rejected the entirety of Dr. Raag's August 4, 2008, report as "conclusory" [AR at 14], which the Court addresses supra.

[14] As the ALJ's consideration on remand of the RCMH treating sources' opinions, including those of Dr. Raag, may impact on the other issues raised by plaintiff in the Joint Stipulation, the Court exercises its discretion not to address those issues in this Order.